## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DARRYL BROWN**
                Plaintiff,

v.

**DTE ELECTRIC COMPANY**
                Defendant.

Case No.
Hon.

---

**MILLER COHEN, PLC.**
Richard G. Mack (P58657)
Andrea M. Frailey (P82466)
*Attorneys for Plaintiff*
7700 Second Avenue, Suite 335
Detroit, MI  48202
(313) 964-4454 Phone
(313) 964-4490 Fax
rmack@millercohen.com
afrailey@millercohen.com

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

There is no other pending or resolved civil
action arising out of the transactions or
occurrences alleged in this Complaint.

      **NOW COMES** Plaintiff, **DARRYL BROWN**, on behalf of himself and all

similarly situated persons, known or unknown, by and through his attorneys,

MILLER COHEN, PLC, and for his Complaint against Defendant, DTE ELECTRIC COMPANY, states as follows:

## INTRODUCTION

1.    Plaintiff brings this Complaint on behalf of himself and other individuals currently, or previously, employed by DTE Electric Company ("DTE" or "Defendant") as System Supervisors.

2.    Defendant violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and the Michigan Workforce Opportunity Wage Act ("MWOWA"), M.C.L. § 401.411, *et seq.*, when it engaged in illegal policies depriving Plaintiff and similarly situated employees, known or unknown, of fair compensation for their labor.

3.    Defendant schedules System Supervisors to work 48 hours a week every other week and does not pay the System Supervisors time and a half for these additional eight hours.

4.    Defendant does pay the System Supervisors straight time for these eight hours, displaying that Defendant recognizes the System Supervisors' entitlement to overtime pay.

5.    On January 27, 2017, Terry Morgan, the Regional Director for Region 7 of the National Labor Relations Board, ("Regional Director") found that the System Supervisors did not perform any of the supervisory functions listed in Section 2(11)

2

of the National Labor Relations Act, 29 U.S.C. § 152(11).  (**Exhibit A**, Decision and Direction of Election, Case 07-RC-161830 (2017), hereafter "RD Decision").

6.      As such, Defendant knew, or should have known, as early as January 2017 that the System Supervisors are non-exempt employees and therefore entitled to time and a half for all hours worked over 40 in any given week.

7.      System Supervisors also work 15-30 minutes before and after their shift to complete the changeover ("Changeover Time") – a process by which one employee ends their shift and passes their job duties over to another employee starting their shift.

8.      Only one System Supervisor is paid for the Changeover Time, therefore the other System Supervisor performing the changeover is not compensated for their work.

9.      Defendants violated the FLSA and MWOWA provisions regarding payment of overtime wages.

## ARBITRAL PROCEEDINGS

10.     Other individuals who worked as System Supervisors filed a Demand for Arbitration with the American Arbitration Association on June 7, 2022.  The action is currently pending with Case No. 01-22-0002-4363.

11.     Plaintiff did not join the Arbitration proceedings because he did not sign an arbitration agreement with DTE.

3

12.     In its Answer to the Demand for Arbitration, DTE asserted an affirmative defense claiming "[a]rbitration is not an appropriate forum for adjudication of this … action because not all Systems Supervisors employed by Defendant sign arbitration agreements."

13.     On information and belief, there are similarly situated Systems Supervisors who did not sign arbitration agreements.

14.     Therefore, Plaintiff now brings this collective action under FLSA and class action under MWOWA on behalf of a class of similarly situated employees, known and unknown, who are currently, or previously, employed by Defendant as System Supervisors I's and System Supervisors II's.

## **PARTIES**

15.     Plaintiff Darryl Brown, a resident of Detroit, Michigan, presently works for Defendant as a System Supervisor and has since 2003.

16.     Defendant DTE, a domestic profit corporation, has its registered address in East Lansing, Michigan and its corporate headquarters in Detroit, Michigan.

17.     Plaintiff brings this action on his own behalf and on behalf of others similarly situated, including all individuals in the State of Michigan who are or were employed by Defendant as System Supervisors, and who are or were (1) subject to illegally denied appropriate overtime compensation under the FLSA and MWOWA; and/or

4

(2) were forced to work off the Changeover Time without pay in violation of the FLSA and MWOWA's overtime wage requirements.

18.     Similarly situated individuals may choose to opt-out of this action pursuant Federal Rule of Civil Procedure 23.

## JURISDICTION AND VENUE

19.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff brings his claim pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

20.     Venue is proper in this Court because DTE is licensed to conduct business throughout the State of Michigan, including the Eastern District of Michigan, and has its corporate headquarters in the Eastern District of Michigan.  28 U.S.C. 1391(c) & (d).

## GENERAL ALLEGATIONS

21.     DTE "is a Detroit-based diversified energy company involved in the development and management of energy-related businesses and services nationwide. Its operating units include an electric utility serving 2.2 million customers in

Southeastern Michigan and a natural gas utility serving 1.3 million customers in Michigan."[1]

22.    Defendant employed Plaintiff and similarly situated employees, known and unknown, as System Supervisors throughout Southeastern Michigan.

23.    On January 27, 2017, Terry Morgan, the Regional Director for Region 7 of the National Labor Relations Board, ("Regional Director") found that the System Supervisors did not perform any of the supervisory functions listed in Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11).  **Exhibit A**, RD Decision, at pp. 18-19.

24.    Based on the Regional Director's analysis, Defendant knew, or should have known, as early as January 2017, that the System Supervisors are non-exempt employees and therefore entitled to time and one-half for all hours worked over 40 in any given week.

25.    The Central System Supervisor position referenced in the RD decision has been renamed System Supervisor I, but the job duties for the position have not changed since the RD decision.

---

[1] "About DTE," accessed on April 12, 2022.
https://newlook.dteenergy.com/wps/wcm/connect/dte-web/home/about-dte/common/about-dte/about-dte

26.     The Regional System Supervisor position referenced in the RD decision has been renamed System Supervisor II, but the job duties for the position have not changed since the RD decision.

27.     Plaintiff and similarly situated employees, known and unknown, had their income reported on a W-2 and were paid through payroll.

28.     The System Supervisors work shifts which are at least twelve (12) hours long; either from 6:00 AM to 6:00 PM or 6:00 PM to 6:00 AM.

29.     Defendant pays its System Supervisors on a salary basis with a set annual salary.

30.     System Supervisors work a 48/36 shift schedule where they work four twelve hour shifts one week, and three twelve hours shifts the next week.

31.     Defendant pays its System Supervisors a fixed amount of compensation for each of the two weeks, plus straight time at their regular rate (as defined by the law) for hours worked above forty (40) in a week.

32.     Defendant tracks its System Supervisors' overtime hours.

33.     Under the 48/36 shift schedule, annually, Defendant schedules its System Supervisors to work approximately 208[2] total hours beyond forty (40) in a week.

---

[2] Eight hours a pay period multiplied by 26 pay periods in a year totals 208 overtime hours per year.

34.     Defendant also regularly adds additional overtime shifts to a System Supervisor's schedule.

35.     Sometimes Defendant uses volunteers for these additional shifts and sometimes Defendant simply adds the shift to a System Supervisor's schedule.

36.     The System Supervisors are required to work these added shifts.

37.     Further, as part of a policy or practice, Defendant only pays one System Supervisor for Changeover Time, which occurs during shift change.

38.     During a shift change, the exiting System Supervisor and the entering System Supervisor perform a changeover whereby they turn over the System Supervisor job duties from one employee to the other in accordance with DTE protocol.

39.     The changeover takes 15-30 minutes.

40.     If an entering System Supervisor is scheduled to work at 6:00 AM and they arrive earlier than 6:00 AM to perform the changeover, they will not be paid for any time before 6:00 AM.

41.     If an exiting System Supervisor is scheduled to work until 6:00 AM and they do not finish the changeover until after 6:00 AM, they are not paid for any time after 6:00 AM.

42.     The Changeover Time constitutes compensable time under the FLSA and MWOWA because these are principal activities or integral and indispensable to principal activities.

8

**The Systems Supervisors are Non-Exempt Employees Under the FLSA.**

43.    The System Supervisors are non-exempt employees under the FLSA.  29 U.S.C. § 213.

**The System Supervisors are Not Exempt under the Executive Exemption**

44.    To qualify as an exempt "employee employed in a bona fide executive capacity," 29 U.S.C. § 213 (a)(1), the employee must meet all four of the following requirements, 29 C.F.R § 541.100(a):

    a.    Receive compensation greater than that laid out in 29 C.F.R. § 541.100(a)(1).

    b.    Have a "primary duty [that] is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;"

    c.    Must "customarily and regularly direct[] the work of two or more other employees;" AND

    d.    Have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

45.    The System Supervisors do not satisfy these four criteria.

9

46.     The System Supervisors' primary duty is to maintain the electrical grid, not manage DTE or any other subdivision of DTE.

47.     System Supervisors do not direct the work of any employees as the System Supervisors do not assign daily overall duties to field employees.

48.     For instance, when a System Supervisor needs a field employee to go to a specific job, the System Supervisor must contact the field employee supervisor and request a field employee be deployed to a specific job – the System Supervisor does not ask for field employees by name, nor do they speak with the field employee to direct them to a job site.  (**Exhibit A**, at p. 12, Regional Director Decision)

49.     System Supervisors do not have the authority to discipline any field employees, let alone hire or fire anyone.  (**Exhibit A**, at p. 16)

50.     Systems Supervisors are not exempt as executives.

**The System Supervisors are Not Exempt under the Administrative Exemption**

51.     To qualify as an exempt "employee employed in a bona fide administrative capacity," 29 U.S.C. § 213 (a)(1), the employee must meet all three of the following requirements, 29 C.F.R § 541.200(a):

    a.     Receive compensation greater than that laid out in 29 C.F.R. § 541.200(a)(1).

    b.     Have a "primary duty [that] is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" AND

    c.     Have a "primary duty [which] includes the exercise of discretion and independent judgment with respect to matters of significance."

52.    The System Supervisors' primary duty is to maintain the electrical grid which is manual work.

53.    The Systems Supervisors' primary duty is not directly related to the management or general business operations of DTE.

54.    The System Supervisors do not "exercise independent judgment in assigning field employees to outage locations." (**Exhibit A**, at p. 15)

55.    The Systems Supervisors are not exempt as administrators.

**The System Supervisors are Not Exempt under the Learned Professional Exemption**

56.    To qualify as an exempt learned professional, 29 U.S.C. § 213 (a)(1), the employee must meet all four of the following requirements, 29 C.F.R § 541.300(a):

    a.     Receive compensation greater than that laid out in 29 C.F.R. § 541.300(a)(1).

11

b.    Have a primary duty of performing work requiring advanced knowledge, defined as work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment;

c.    The advanced knowledge the work requires must be "in a field of science or learning;" AND

d.    The advanced knowledge required by the work must be "customarily acquired by a prolonged course of specialized intellectual instruction."

57.    In performing their work, the System Supervisors do not "exercise independent judgment in assigning field employees to outage locations." (**Exhibit A**, at P. 15)

58.    The System Supervisor position does not require advanced knowledge in a field of science or learning.

59.    The System Supervisors' work is not predominantly intellectual in character and does not require the consistent exercise of discretion and judgment.

60.    The System Supervisor position requires a high school degree, not advanced knowledge acquired through a lengthy course of "specialized intellectual instruction."

61.    The Systems Supervisors are not exempt as learned professionals.

**The System Supervisors are Not Exempt under the Creative Professional Exemption**

62.    To qualify as an exempt creative professional, 29 U.S.C. § 213 (a)(1), the employee must meet both of the following requirements, 29 C.F.R § 541.300(a):

a.    Receive compensation greater than that laid out in 29 C.F.R. § 541.300(a)(1).

b.    Have a primary duty of performing work "[r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor."

63.    The System Supervisor's primary duty is to maintain the electrical grid which is not a creative endeavor.

64.    The System Supervisors' primary duty is not the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor, as opposed to routine mental, manual, mechanical or physical work.

65.    The Systems Supervisors are not exempt as Creative professionals.

**The System Supervisors are Not Exempt under the Highly Compensated Employee Exemption**

66.    "Highly compensated employees" are exempt under 29 U.S.C. § 213(a)(1). 29 C.F.R. § 541.601.

13

67. To qualify as an exempt "highly compensated employee," an employee must meet both of the following requirements:

    a.    Receive compensation greater than that laid out in 29 C.F.R. § 541.601(a)(1); AND

    b.    "[C]ustomarily and regularly perform[] any one or more the exempt duties or responsibilities of an executive, administrative or professional employee."

68. As detailed in Paragraphs 41-46 of this Complaint, System Supervisors do not meet all of the requirements for the executive exemption.

69. As detailed in Paragraphs 47-51 of this Complaint, System Supervisors do not meet all of the requirements for the administrative exemption.

70. As detailed in Paragraphs 52-57 of this Complaint, System Supervisors do not meet all of the requirements for the learned professional exemption.

71. As detailed in Paragraphs 58-61 of this Complaint, System Supervisors do not meet all of the requirements for the creative professional exemption.

72. Since the System Supervisors do not "customarily and regularly" perform any of the exempt duties or responsibilities under the executive, administrative, or professional employee exemptions, they are not exempt under the highly compensated employee exemption.

14

**The System Supervisors are Not Exempt under the Computer Employee Exemption**

73.     To qualify as an exempt computer employee under the FLSA, the employee must be employed as a "[c]omputer systems analysts, computer programmers, software engineers or other similarly skilled workers."  29 U.S.C. § 213(a)(17); 29 C.F.R. 541.400(a).

74.     The System Supervisors are not computer systems analysts, computer programmers, or software engineers.

75.     The System Supervisor position is not similar to these positions.

76.     As such, the System Supervisors are not exempt computer employees under the FLSA.

**The System Supervisors are Not Exempt under the Outside Sales Exemption**

77.     To qualify as an exempt "outside salesman" under the FLSA, 29 U.S.C. § 213(a)(1), the employee must meet both of the following requirements, 29 C.F.R. 500(a):

   a.     (1) have a primary duty "making sales" or "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer;" AND

b.      Be "customarily and regularly engaged away from the employer's place or places of business."

78.     The System Supervisors do not make sales, nor do they obtain "orders or contracts for services or for the use of facilities."

79.     The System Supervisors are not exempt outside sales employees under the FLSA.

**The Systems Supervisors are non-exempt employees under the MWOWA.**

80.     The Systems Supervisors are non-exempt employees under the MWOWA. M.C.L § 404.414a.

**DTE Knew, or Should Have Known, that the System Supervisors are Non-Exempt and Therefore Entitled to One and a Half Times Their Regular Rate for Any Overtime**

81.     As outlined above of this Complaint, the Regional Director's findings of fact in 2017 demonstrate that the System Supervisors are non-exempt employees under the FLSA or the MWOWA.

82.     Since Defendant was a party to the 2017 NLRB case, Defendant knew, or should have known, that the System Supervisor I and System Supervisor II positions are non-exempt employees under the FLSA and MWOWA.

83.     Despite such knowledge, Defendant continued to fail to properly compensate the System Supervisors for more than five years.

84.     On information and belief, Defendant followed, and continues to follow, the practices described above.

## CLASS AND COLLECTIVE ACTION

85.     Plaintiff incorporates by reference all preceding paragraphs.

86.     Count I is brought as collective actions under the FLSA, 29 U.S.C. § 216(b).

87.     Count II is brought as a class action under the MWOWA and is governed by Federal Rule of Civil Procedure 23.

88.     The representative and those similarly situated have been equally affected by Defendant's policies and practices in violation of FLSA.

89.     Furthermore, those class members still employed by Defendant may be reluctant to raise individual claims for fear of retaliation.

90.     The issues in this lawsuit present common questions of law and fact that predominate over any variations, if any, which may exist between individuals within the class.

91.     The representatives, those similarly situated, and Defendant have a commonality of interest in the subject matter and remedy sought.

92.     A class and collective action is appropriate because the Plaintiff is "similarly situated" to other potential class members.

93.     The class of individuals on behalf of whom the named Plaintiff brings this class and collective action are similarly situated because they have been or are

17

employed by DTE in the same or similar positions as the individually named Plaintiff; all individuals were or are subject to the same or similar unlawful practices, policies, or plans as the individually named Plaintiff; and their claims are based upon the same legal theory as those of the named Plaintiff.

94.     A class action is appropriate because Plaintiff meets the requirements of Fed. R. Civ. Pro. Rule 23.

95.     The precise number of individuals in the class is known only to the Defendant, but the class is believed to include over 100 individuals.  Joinder of all class members is impracticable.

96.     There are questions of law and fact common to the class.  The common questions include but are not limited to:

    a.     Whether Defendant failed to pay overtime at time-and-a-half for all compensable hours;

    b.     Whether Defendant failed to include the hours spent by System Supervisors performing the changeover before and after their shifts;

    c.     Whether Plaintiff and class members are entitled to actual or liquidated damages and the other requested relief.

97.     Plaintiff's claims are typical of the class he seeks to represent.  Plaintiff and the class work or have worked for DTE and have been subjected to a pattern or practice of overtime violations.  Defendant acted and refused to act on grounds

18

which are generally applicable to the class, which makes declaratory relief with respect to the class appropriate. These typical, common claims predominate over any questions affecting only individual class members.

98.   The representative is able to fairly and adequately represent and protect the interests of those similarly situated. The named Plaintiff has the same interests as do the other members of the class and they will vigorously prosecute these interests on behalf of the class.

99.   Plaintiff's counsel is competent and experienced in complex class action employment litigation. Plaintiff's counsel has handled numerous actions in federal courts, including collective actions under the FLSA.

100.   If individual actions were required to be brought by each injured or affected member of the class, the result would be a multiplicity of actions creating a hardship to those similarly situated, Defendant, and the resources of the Court.

101.   A class action is an appropriate method for fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

102.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation, particularly in the context of wage litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in arbitration against a corporate defendant. The members of the class have been damaged and are entitled to recovery as a result of

Defendant's common and uniform policies, practices, and procedures. Many members of the class are unaware of their rights to prosecute these claims and lack the means or resources to secure legal assistance. The relative damages suffered by individual members are small compared to the expense and burden of individual prosecution of this litigation.

103.   In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's actions.

104.   A class action can be managed without undue difficulty because the class includes two job titles which can easily be pulled as Defendant is required to maintain detailed records concerning each class member.

105.   Further, Defendant kept records of its violations by explicitly writing on every paystub how many overtime hours the individual employee worked and stating that they were paid straight time instead of time and a half.

## COUNT I

**VIOLATION OF THE FAIR LABOR STANDARDS ACT**
**COLLECTIVE ACTION**
**Nonpayment of Overtime**

106.   Plaintiff incorporates by reference all preceding paragraphs.

107.   At all times relevant to this action, Plaintiff and all similarly situated persons, known or unknown, were employees of Defendant within the meaning of the FLSA 29 U.S.C. § 203(e).

108.   At all times relevant to this action, Defendant was the employer(s) of Plaintiff, and all similarly situated persons, known or unknown, within the meaning of the FLSA, 29 U.S.C. § 203(d).

109.   At all times relevant to this action, Plaintiff and all similarly situated persons, known or unknown, were entitled to time and a half for all hours worked over forty per week.  29 U.S.C. § 207.

110.  Defendant knowingly, intentionally, and willfully violated the FLSA's overtime provisions by only paying Plaintiff straight time for hours worked over forty each week, as opposed to time and a half.

111.   Defendant knowingly, intentionally, and willfully violated the FLSA's overtime provisions by not paying Plaintiff for time spent performing the changeover at the beginning and end of their shifts.

112.   Defendants have a pattern and practice of failing to properly follow the FLSA provisions for overtime compensation, as evidenced by the experiences of the named Plaintiff and class members.

WHEREFORE, Plaintiff and similarly situated employees, known and unknown, are entitled to an award of damages including but not limited to back pay

for all unpaid overtime, compensatory damages, liquidated damages, punitive damages, costs, attorneys' fees, prejudgment interest, and other damages as allowed by law and equity.

## **COUNT II**

### **VIOLATION OF THE MICHIGAN WORKFORCE OPPORTUNITY WAGE ACT CLASS ACTION Nonpayment of Overtime**

113. Plaintiff incorporates by reference all preceding paragraphs.

114. At all times relevant to this action, Plaintiff and all similarly situated persons, known or unknown, were employees of Defendant within the meaning of the MWOWA. M.C.L. § 408.412(c).

115. At all times relevant to this action, Defendant was the employer(s) of Plaintiff, and all similarly situated persons, known or unknown, within the meaning of the MWOWA. M.C.L. § 408.412(d).

116. At all times relevant to this action, Plaintiff and all similarly situated persons, known or unknown, were entitled to time and a half for all hours worked over forty per week.  M.C.L. § 404.414a.

117.   Defendant knowingly, intentionally, and willfully violated the MWOWA's overtime provisions by only paying Plaintiff straight time for hours worked over forty each week, as opposed to time and a half.

118.   Defendant knowingly, intentionally, and willfully violated the MWOWA's overtime provisions by not paying Plaintiff for time spent performing the changeover at the beginning and end of their shifts.

119.   Defendants have a pattern and practice of failing to properly follow the MWOWA provisions for overtime compensation, as evidenced by the experiences of the named Plaintiff and class members.

WHEREFORE, Plaintiff and similarly situated employees, known and unknown, are entitled to an award of damages including but not limited to back pay for all unpaid overtime, compensatory damages, liquidated damages, punitive damages, costs, attorneys' fees, prejudgment interest, and other damages as allowed by law and equity.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff **DARRYL BROWN**, and on behalf of other persons similarly situated, known and unknown, request that the Court enter the following relief:

a. Permission for individuals throughout the State of Michigan who are currently employed or were employed by Defendant as System Supervisors who were subjected to impermissible overtime compensation practices, to opt-in to this action, pursuant to § 216(b) of the FLSA;

b. Certification of a class action for individuals throughout the State of Michigan who are currently employed or were employed by Defendant as System Supervisors who were subjected to impermissible overtime compensation practices pursuant to Federal Rule of Civil Procedure 23;

c. Back pay for the unpaid overtime compensation, under the FLSA and the MWOWA;

d. Liquidated and multiple damages as allowed by law, including double damages under the FLSA;

e. Compensatory damages and punitive damages as allowable under FLSA or MWOWA;

f. An injunction prohibiting Defendants from further violations of the law as described here;

g. Post-judgment assignment of attorneys' fees, costs, and interest; and

h. Any other relief to which Plaintiff may be entitled.

Respectfully submitted,
**MILLER COHEN, PLC**

By:  _/s/ Andrea M. Frailey_____
**MILLER COHEN, PLC**
Richard G. Mack (P58657)
Andrea M. Frailey (P82466)
*Attorneys for Plaintiff*
7700 Second Avenue, Suite 335
Detroit, MI  48202
(313) 964-4454 Phone
(313) 964-4490 Fax
rmack@millercohen.com
afrailey@millercohen.com

Dated: November 1,  2022

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


**DARRYL BROWN**
                            Plaintiff,                    Case No.
                                                         Hon.
v.

**DTE ELECTRIC COMPANY**
                      Defendant.

_____

**Miller Cohen, PLC.**
Richard G. Mack (P58657)
Andrea M. Frailey (P82466)
*Attorneys for Plaintiff*
7700 Second Avenue, Suite 335
Detroit, MI  48202
(313) 964-4454 Phone
(313) 964-4490 Fax
rmack@millercohen.com
afrailey@millercohen.com

_____


## <u>DEMAND FOR TRIAL BY JURY</u>


  **NOW COMES** Plaintiff, **Darryl Brown**, on behalf of himself

and all similarly situated persons, known or unknown, by and through

his attorneys, **MILLER COHEN, P.L.C.**, and hereby demands a trial

by jury, for all issues so triable.


26

Respectfully submitted,
**MILLER COHEN, PLC**

By:    */s/ Andrea M. Frailey*             
**MILLER COHEN, PLC**
Richard G. Mack (P58657)
Andrea M. Frailey (P82466)
*Attorneys for Plaintiff*
7700 Second Avenue, Suite 335
Detroit, MI  48202
(313) 964-4454 Phone
(313) 964-4490 Fax
rmack@millercohen.com
afrailey@millercohen.com

Dated: November 1,  2022

# EXHIBIT A

.UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION SEVEN

**DTE ELECTRIC COMPANY**

       Employer

    and                                 **Case 07-RC-188032**

**LOCAL 223, UTILITY WORKERS
UNION OF AMERICA, AFL-CIO**

       Petitioner

### ERRATUM

      The Decision and Direction of Election that issued in the above matter on January 27, 2017,  inadvertently was captioned as Case 07-RC-161830 and should be changed to reflect the correct case number as listed above, Case <u>07-RC-188032</u>.

Dated:   1 February 2017

_____
**Terry Morgan
Regional Director
National Labor Relations Board, Region 7
Patrick V. McNamara Federal Building
477 Michigan Avenue,  Room 300
Detroit, Michigan   48226**

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION SEVEN**

**DTE ELECTRIC COMPANY**[1]

        **Employer**

       **and**                                      **Case 07-RC-161830**

**LOCAL 223, UTILITY WORKERS**
**UNION OF AMERICA, AFL-CIO**

        **Petitioner**

**APPEARANCES**

Adam S. Forman and Mark M. Swirsky, Attorneys of Southfield, Michigan, for the Employer.
Lisa M. Smith, Attorney of Southfield, Michigan, for the Petitioner.

**DECISION AND DIRECTION OF ELECTION**

        The Employer generates and sells electricity to customers located in the State of Michigan.  Petitioner seeks to represent the Employer's 54 system supervisors working at and out of its System Operations Center located in Detroit, Michigan.

        The Employer takes the position that the petitioned-for employees, formerly known as central system supervisors (CSSs) and regional system supervisors (RSSs), were previously found by the Board and Courts[2] to be supervisors within the meaning of the Act, and continue to perform the same supervisory duties without any significant changes.  Thus, they remain supervisors within the meaning of Section 2(11) of the Act based on their unchanged authority to assign, responsibly direct, and effectively recommend hiring and discipline, using discretion and independent judgment.

        The Petitioner takes the position that there have not only been significant changes in the job duties between the former CSSs and RSSs and the petitioned-for employees, but there have also been significant changes in Board law regarding supervisory status, such that that the petitioned-for employees are not supervisors as defined in Section 2(11) of the Act because they

---

[1] The Employer's name appears as amended at the hearing.
[2] Most recently in 1995, in Case 07-RC-20715, the Regional Director dismissed a petition filed by Local 17, International Brotherhood of Electrical Workers, AFL-CIO to represent CSSs and RSSs relying on the 6th Circuit Court of Appeals decision in **NLRB v. Detroit Edison Co**., 537 F.2d 239 (1976), enforcing 216 NLRB 1022 (1975).

1

do not engage in any supervisory activities or use independent judgment when performing their job duties.

As discussed below, based on the record and relevant Board law, I conclude that the Employer has not satisfied its burden of proof that the petitioned-for employees exercise authority in the interest of the Employer requiring the use of independent judgment to assign and responsibly direct, or recommend hiring or discipline of employees, or that they are held accountable by the Employer for such actions, and thus, they are not statutory supervisors. Petitioner's proposed unit is appropriate.

## I.  Employer's Procedural Arguments

### A.  Relitigation of Supervisory Status and Changed Circumstances

The Employer argues that the Petitioner should not have been entitled to relitigate decisions previously finding the petitioned-for employees, formerly referred to as CSSs and RSSs, to be supervisors where, as here, Petitioner has failed to show any changed circumstances that justify such relitigation in the instant matter.

I reject the Employer's contention that the Petitioner may not file the instant petition based on its belief that circumstances have changed such that the employees in question are no longer supervisory within the meaning of Section 2(11).  In so finding, I reject the cases cited by the Employer in its memorandum of points of authority, cases previously cited by this Region in its 1995 decision in 07-RC-20715.  Specifically, in *Harvey's Wagon Wheel, Inc*., 271 NLRB 306, 306 (1984), an unfair labor practice proceeding, the Board found that the doctrine of collateral estoppel bars a party from further litigation of an issue previously decided as long as the identical issue was fully litigated in the earlier case and there has been no significant change in the job involved.  In *Wonder Markets, Inc*., 249 NLRB 294, 295 (1980), the Board found that the doctrine of res judicata did not apply in a back pay proceeding involving two separate causes of action.

Rather, I reference the Board's longstanding rule in unit clarification proceedings that with newly discovered evidence, previously unavailable evidence, or changed circumstances, a party may challenge the validity of a union's certification based on a belief that the unit members are statutory supervisors, even if it failed to raise such issue during the representation proceeding.  *I.O.O.F. Home of Ohio, Inc*., 322 NLRB 921, 922-923 (1997).

The Board has also found that while it may be that certain of the positions sought to be excluded by a unit clarification petition have long been included under previous contracts, and the job duties of those positions have remained unchanged, nonetheless, if it can be shown that the persons in such positions meet the test for establishing supervisory, managerial, or confidential status, it is compelled to exclude them.  See *The Washington Post*, 254 NLRB 168, 169 (1981).  If there are no changed circumstances in terms of job duties, this, too, may constitute evidence on the status of the individuals sought to be excluded.  *The Washington Post*, supra at 169.  Similarly, in the instant matter if there are changed circumstances, newly discovered evidence, or previously unavailable evidence presented  such that these employees

2

who were once found to be supervisory no longer exercise or are in possession of such authority, then I am compelled to so find and provide them the opportunity to vote whether to be represented by the Petitioner in a collective bargaining unit.

### B.  Future Operational Restructuring and Imminent and Certain Elimination of Proposed Voting Unit

Relying on cases in which the Board found that permanent changes to the scope and composition of an otherwise appropriate unit were *imminent and certain* (emphasis added),[3] the Employer argues that its proposed operational restructuring will result in the imminent and certain elimination of the bargaining unit sought herein as the SSs will unquestionably be statutory supervisors with respect to the daily supervision of operations resource coordinators (ORCs) in central dispatch.  This issue was not raised by the Employer in its Statement of Position filed in response to the filing of the petition.  At the hearing, the Employer attempted to place evidence into the record on this issue and make an offer of proof.  The hearing officer rejected this evidence and offer of proof and the Employer appealed such ruling.  I denied the Employer's special appeal.  On the same basis that I denied the Employer's special appeal, I find that such evidence is speculative and should not be considered.

### II.  Overview

### A.  Employer's Operation

The Employer is a natural gas and electrical utility engaged in the production, transmission, storage, and distribution of natural gas and electricity to residential and commercial customers in communities located throughout Michigan.  The Employer distributes and transmits electricity to its customers from approximately 700 substations in the state to customers via overhead lines and underground cables.  Substations are facilities containing electrical equipment, including breakers and transformers.  This distribution and transmission process is monitored by employees in the main System Operations Center (SOC) located at the Employer's headquarters in downtown Detroit.  The SOC is the control center for the Employer's entire electrical system and is part of the company's Distribution Operations division.  Distribution Operations also includes substation operations; service operations, encompassing overhead and underground line service operations; and engineering.  All of the petitioned-for SSs work at or out of the SOC, with one or two SSs doing one to two-year rotations involving training student SSs at the Western Wayne Service Center (WWSC) in Bellville, Michigan,[4] and the nine student SSs being trained between the SOC and WWSC.

The system operations group at the SOC, including the SSs at issue herein, is responsible for monitoring the operation of the Employer's distribution and transmission system.  The head of system operations is Director George Mundorf.  System operations Managers Michael Sheufelt, Demita Beard, Cathryn McLain and Michael Pederson report directly to Mundorf.

---

[3] ***Hughes Aircraft Co***., 308 NLRB 82 (1992); ***Larson Plywood Co., Inc***., 223 NLRB 1161 (1976).
[4] Also known as the alternate SOC.

3

Approximately ten senior SSs (SSSs)[5] report directly to Sheufelt and one SSS reports to Beard.[6] All of the SSs, including nine student SSs, report directly to the SSSs.  The SOC is staffed 24-7 by these employees in addition to an unknown number of process coordinators (PCs) and schedulers, or work planners, who also work in the SOC.

The employees who work in the field are union-represented.  Petitioner currently represents underground linemen; substation employees, including substation operators (SOs), electrical maintenance journeymen (EMJs), structural maintenance journeyman (SMJs), riggers, and area field coordinators (AFCs); central dispatch operations resource coordinators (ORCs); primary service representatives; power plant operators; and relay technicians.  Overhead linemen are currently represented by Local 17, International Brotherhood of Electrical Workers (IBEW), AFL-CIO.  The overhead, underground and substation bargaining unit employees perform the work in the field and at substations to maintain and repair the lines and equipment in the distribution and transmission system.  The ORCs, who work in central dispatch located in an office at the downtown Detroit headquarters, are responsible for dispatching the overhead and underground field employees.  The AFCs, who work out of the Employer's service centers,[7] are responsible for dispatching the substation field employees.  The unit employees number approximately 300 overhead employees, 80 underground employees, 80 SOs, 130 EMJs, 10 AFCs, 10 ORCs, and an unknown number of primary service representatives, power plant operators, relay technicians, SMJs, and riggers.

All of these unit employees report directly to first-line supervisors (also referred to as field supervisors) who report to general supervisors.  The record references the number of first-line and general supervisors for only some of the unit classifications.  In substations operations, the SOs report to 22 first-line substation supervisors,[8] based in the Employer's service centers, who report to seven general supervisors.  In central dispatch, the ORCs report to six first-line supervisors who report to three general supervisors who report to the manager for central dispatch.  The parties are in agreement that at least one of the general supervisors, Michael Davis, general supervisor of substation operations, possesses authority to hire and fire and is a supervisor within the meaning of Section 2(11).

### 1. EMS/SCADA

The Employer maintains a computerized energy management system (EMS) to evaluate the distribution and transmission system and ensure its reliability.  Supervisory Control and Data Acquisition System (SCADA) is part of the EMS that provides notifications of trouble within the system and data concerning system operations such as amounts of load and voltage on lines, and faulty breakers and circuits located at substations and in the field.  An example of information accessed via SCADA includes alarms resulting from a sudden change in voltage, a tripped line,

---

[5] The parties stipulated that all SSSs are supervisors within the meaning of Section 2(11) of the Act, and that SSSs Gary Tremberth and Gary Jones are statutory supervisors based on their authority to hire, discipline and discharge.
[6] Beard is the manager in charge of work processes at the outage coordination center (OCC), contained within the SOC.
[7] The Employer has four service centers:  the Caniff service center, the Shelby service center, the Pontiac service center, and the Western Wayne service center.
[8] These first-line substation supervisors, also known as area leaders, include 11 operating supervisors and 11 maintenance supervisors.

4

or an open breaker.  The SSs are trained regarding SCADA.  The SSs are responsible for receiving the SCADA alert, analyzing the data received, devising a plan for power restoration, and enacting the plan by requesting that field employees be deployed to the trouble location. SCADA also enables SSs, who perform switching activities as described below, to remotely operate affected equipment and interrupt customer load.  This can avoid the process of dispatching an employee to the field to carry out the switching and repair the faulty equipment. System problems can also be relayed to SSs from substations via substation alarms, from reports in the field, as well as by trouble call-ins from customers which are relayed to SSs.

## 2.    Switching and Tagging

Switching involves the opening and closing of electrical circuits and rerouting the flow of power to different electrical pathways without disrupting overall electrical service in the distribution and transmission system.  The switching process involves interrupting the flow of electricity in power lines or circuits so that field employees can perform routine maintenance or repair on the damaged line or equipment.  Switching is also performed to restore the flow of electricity to power lines that have been serviced or repaired.  Switching is necessary for shutdowns that are planned, as well as unplanned.  Planned shutdown work is referred to as scheduled request for shutdown (scheduled RSD) work.  Unplanned shutdown work is referred to as trouble request for shutdown (TRSD) work.  Approximately 40 percent of shutdowns are planned and 60 percent are unplanned.  Scheduled RSD work, such as preventive maintenance work and project work, is performed by employees in substations or along distribution/transmission lines in the field.  The field employees assigned to perform the switching operation generally receive copies of the SS's written switching order in advance of the operation from their direct supervisor.  TRSD work, such as equipment failure due to storms or accidents, and tripped lines, is performed when unexpected trouble arises that must be addressed immediately.  This switching is often performed without a written switching order.  In this case, the SS orally communicates the switching sequence directly to the field employee executing the operation.

Switching orders are plans that are drafted by SSs and carried out by field employees. Most often, the field employee executing the switching operation is an overhead or underground lineman, or an SO.  However, the record indicates that primary service representatives and engineers can be involved in switching operations as well.  Many switching orders merely involve the SS identifying the faulty equipment and making a basic one-step request to repair to a field employee who is skilled in performing the repair work without direction.  Some switching orders involve more detailed sequential step-by-step procedures to open and close switches and reconnect lines.  These more complicated switching orders are often reviewed by and discussed with SSSs.  In many instances, these steps are determined by protocol per company policies and procedures.  In drafting switching orders, the SSs have a multitude of written guidance available to them and are bound by protocol and procedures stated therein.  Written guidance includes system operating practices (SOPs), standard work instructions (SWIs), administrative procedures (APs), normal operating procedures (NOPs), emergency operating procedures (EOPs), abnormal operating procedures (AOPs), training manuals, job memos, circuit maps, and one-line

5

diagrams.[9]  SSs are also bound by an abundance of regulations and standards set by outside agencies including those issued by Northeast Reliability Corporation (NERC), the governing body that oversees operation of electric transmissions systems in North America, and Midcontinent Independent Systems Operator (MISO), an operating agent for electrical systems in the Midwest US and part of Canada.  Field employees have written guidance available to them as well for carrying out switching orders such as handbooks for substations operations and overhead lines.  SSs and field employees sign off on switching orders to signify that the switching is complete and power is restored.

SSs are also responsible for drafting tagging plans which involve placing protective tagging on equipment in order to shut the equipment down for maintenance and/or repair.  Sometimes, tagging can be accomplished remotely through SCADA.  Other times, the equipment has to be physically tagged by a field employee, in which case the SSs issue tagging orders to field employees involved with switching operations.  Tagging signifies that there is no flow of electricity through a piece of equipment or line.  Once the tagging order issues, the field employee physically places a tag on the equipment to alert anyone with access to the breakers or switches that the equipment cannot be operated.  At the same time, the SS who issued the tagging order places an electronic tag on the equipment through SCADA to alert anyone with access to SCADA that the device is de-energized.

### B.  Duties and Terms and Conditions of Employment of the SSs

#### 1.  SS-1s and SS-2s[10]

The SS position came into existence sometime after 2009.  Before then, the SS position encompassed three classifications:  central system supervisor (CSS), regional system supervisor (RSS), and district system supervisor (DSS).[11]  The SSs are still commonly referred to as CSSs.  The SS position is separated into two classifications: SS-1, formerly CSS, and SS-2, formerly RSS.  Out of the 54 SSs, 27 are SS-1s, 18 are SS-2s and nine are student SSs.  All of the SSs work at or out of the SOC, with one SS doing one-to-two year rotations training student SSs at the WWSC.  The nine student SSs are trained between the SOC and WWSC.  All of the SSs work 12-hour swing shifts from either 6:30 a.m. to 6:30 p.m. (day shift) or 6:30 p.m. to 6:30 a.m. (night shift).  Their schedules are rotated so that they work three days one week and four days the next week.  Eight SSSs work at the SOC and two, involved in training, work between the WWSC and SOC.  There are two SSSs scheduled on the day shift and one on the night shift.  These SSSs work the same rotation schedules as the SSs.

---

[9] The parties stipulated that the Employer's SOPs, SWIs, APs, NOPs, AOPs and EOPs constitute all of the written operating procedures in place at the SOC.

[10] The parties are in agreement that all of the petitioned-for SSs, whether SS-1, SS-2, or a student SS, possess the same duties, responsibilities and authority for purposes of deciding supervisory status herein, and that the only difference between SS-1s and SS-2s is that SS-2s are trained and certified by NERC to handle higher voltage levels contained in the bulk electrical system.

[11] The previous record in 07-RC-20715 demonstrates that the CSS position existed from the 1970's until it was eliminated when the SS position herein was created.  The DSS position existed from the 1970's until a corporate structure reorganization that took place sometime before 1995 at which time the DSS position was eliminated and the RSS position was created. The RSS position was eliminated with the CSS position.

The SOC consists of the main control room and the outage coordination center (OCC), in addition to offices for the SOC managers and director. Most of the SSs work in the main control room which contains a 16-foot high board that constitutes the electrical grid, a map of the Employer's entire electrical system. The grid identifies the functionality of all equipment, circuits and lines within the system. There are ten desks in the control room, five of which are designated for general distribution operations (the distribution desks), two of which are designated for transmission operations (the sub-transmission desks) and two of which are designated to SS-2s as high voltage bulk power (the bulk/transmission desks). Two SSs work in the OCC and are primarily involved in organizing and planning scheduled RSDs.

SS job duties generally include monitoring the distribution and transmission system per standard company practices and guidelines for scheduled RSDs, including switching lines in and out for scheduled work; responding to system events, including TRSDs; and ensuring compliance with NERC real-time operations standards. Normally, operation and control of local equipment in the field is delegated to local management in the field and at the substations. This is known as field jurisdiction. The SSs assume local control based on planned and unplanned outage and shutdown events. This is when the SSs initiate switching and tagging procedures, including drafting, issuing and processing tagging and switching orders to be further processed and carried out by field employees.

Most of the field employees and their supervisors work day shift hours, from about 7:00 a.m. to 4:00 p.m. However, the ORCs in central dispatch work 24/7 round-the-clock shifts; the AFCs in substation operations work staggered shifts from 6:00 a.m. to 6:00 p.m.; and some of the SOs work afternoon shift hours from 4:00 p.m. to midnight. Additionally, the substation front-line supervisors, in addition to an unknown number of other field supervisors, rotate as on-call supervisors into the late afternoon and evening hours during the week such that one field supervisor is always on call from about 4:00 p.m. to midnight.

Scheduled RSDs come into the SOC via intranet email in the form of a scheduled RSD packet from a local resource, or submitter, such as a field supervisor or a local planner. The RSD packet consists of location of equipment in question, estimated length of job, map, cable routing sheet, and a jumper plan from an engineer who has already reviewed the request. The packet is initially reviewed by an SSS who decides, in discussion with engineering, if the job can be assigned immediately to an SS for processing or delayed based on ongoing job constraints. Once assigned, the SS is responsible for reviewing the RSD packet and drafting a switching order to be carried out in the field. In this regard, the SS might contact the submitter of the scheduled RSD to clarify the RSD in order to verify that the RSD will not affect operability of other equipment in the system. The SS's switching order does not request any field employees by name. Rather, it typically requests a general classification of overhead, underground, or SO, based on the equipment and work in question, to perform the switching order at a designated location.[12]

Scheduled RSD jobs normally take place during day shift hours. Once the switching order is drafted by the SS it can be communicated to the field during day shift hours in a number

---

[12] There is also record evidence demonstrating that schedulers working at the SOC handle planned maintenance work regarding scheduled RSDs pre-arranged by local supervision without the involvement of SSs.

of ways.  The SS, or a PC[13] at the request of the SS, can email and communicate the scheduled RSD packet, including switching orders, to a field supervisor who will then assign the switching job to a field employee or crew.  Alternatively, the SS, or a PC at the request of the SS, can contact an ORC in central dispatch to request that a field employee, other than a substation employee, be dispatched to the designated location.  The ORC will then contact a field supervisor who will assign the switching job to a field employee or crew.  In the case of an SO request, the SS, or a PC at the request of the SS, can contact an AFC to contact a substation field supervisor who will assign the switching job to a field employee or crew.  Field supervisors are regularly available and in regular contact with field employees during normal day shift hours into afternoon and evening hours regarding job assignments.

TRSDs can occur at any time and require immediate attention.  Like scheduled RSDs, the SS is responsible for identifying the trouble and requesting a general classification of field employee to be dispatched to the problem site.  If the TRSD occurs during day shift hours, the field employees are requested and dispatched as noted above.  If the TRSD occurs during off-shift hours, or on the weekend or a holiday, then the SS, or a PC[14] at the request of an SS, can communicate the request for field employees to an ORC in central dispatch, or to an on-call supervisor, if one is available.  Alternatively and typically, the SSs, ORCs, or AFCs, can use Automatic Roster Call Out System (ARCOS),[15] the Employer's automated call-in system, to initiate an after-hours request for field employees to designated locations.[16]  Calls for TRSD jobs regularly and automatically entail the requested field employee incurring overtime hours.  In this regard, field supervisors are responsible for inputting overtime rosters for field employees into ARCOS so that ARCOS calculates who is next in line for overtime hours and keeps track of overtime balances for all employees.  Data is also pre-inputted into ARCOS by field supervisors regarding the contractual geographical boundaries of the field employees' work territories.  SSs do not authorize overtime documentation for field employees or keep track of their overtime hours worked or geographical work areas.  Once a call is placed to a field employee via ARCOS, the employee is entitled to accept or reject the call per union contract, unless scheduled as an on-call employee.

It is typical in any switching job performed, whether it involves a scheduled RSD or a TRSD, and whether the switching order is written or verbal, that the field employee dispatched performs some routine pre-switching activities independently, without any involvement of an SS, such as checking operability of surrounding equipment and lines, or switching off a load.  Based on their assessment of equipment and lines at the site, field employees often verbally recommend changes to the switching order which can be approved by the SS.  As stated above, many switching orders are basic one-step requests which the dispatched field employees are skilled to carry out without further direction.  When there is no prepared written switching order, as in the

---

[13] The PC position was created by the Employer in about 2011 to assist the SSs in administrative work such as making calls to request field employees for outages and overhead work.
[14] While the record is unclear regarding the designated shifts of the PCs, there is record evidence that the PCs regularly work during day shift hours 6am to 6pm, and they have some regular availability on the night shift and weekends.
[15] There is some record evidence that the ORCs have another dispatch program available to them called iDispatch, and that the AFCs have a dispatch program available to them called Comet Tracker.
[16] The record demonstrates that some after-hours jobs are pre-inputted into the ARCOS system for automatic dispatch without any involvement of the SSs.

case of a TRSD, once a field employee or crew arrives at the worksite to perform switching work, they are required to follow a strict company procedure:  the field employee calls by telephone or company radio and provides identification by name; the SS provides identification by name; the SS orally gives the switching order; the field employee repeats the switching order back; the SS confirms the switching order and gives the field employee approval to perform the switching work.  Once the switching work is performed, the field employee contacts the SS confirming that the work has been performed.  At job completion, the SS completes a log documenting work performed which the SS and field employee sign off on.  The SS then forwards the log and any other documentation related to the TRSD to an SSS for final signature. The switching process is completed absent any face-to-face contact between the SS and field employee(s) involved.

Once a job assignment is completed, the field employee is generally obligated to report back to the field supervisor, if one is available, for subsequent direction.  Typically the SS does not assign another switching job.  However, on occasion the SS will request the field employee to perform another job in the same location or at another site.  Per union contract, field employees are entitled to accept or reject a subsequent job assignment.  An SS may also request that a field employee "stand-by" at a job site.  This can result in a field employee extending normal shift hours into overtime hours.  The field employee is entitled to reject a request to stand-by and can request to be released from the worksite for any reason.  In this regard, field employees often notify SSs they are "off on time" and have to leave the worksite.  Additionally company rules and regulations dictate maximum hours that field employees may continuously work.  In either case, the SS is responsible for releasing the employee which cannot be accomplished until a relief employee is dispatched to the site.  The record indicates that it is the responsibility of a field or on-call supervisor, when one is available, to dispatch relief employees. Otherwise, an SS can request relief through ARCOS.  A field employee who leaves the work site without being properly released is subject to discipline by field supervision.

Some jobs are prioritized by the SS as "must" or "managed-must" jobs.  These are high priority emergency jobs that take precedence over all other work, such as equipment failure at a mall or stadium, and are worked by field employees continuously around-the-clock to completion.[17]  SSs flag jobs as must or managed-must in the course of their normal duties and typically discuss these jobs with an SSS on duty.[18]  SSs are required to notify an SSS of a decision to prioritize a job as must or managed-must.  These jobs can occur at any time of the day.  Resources and material for this work are arranged by field supervisors who are responsible for ensuring all necessary arrangements are made to complete the must portion of the job.  In this regard, the field supervisors are responsible to keep the SS informed of any status changes affecting productivity or completion.  SSs might decide to request additional field employees in these matters which can involve multiple simultaneous outage issues.  This routinely involves SSs consulting with each other and SSSs regarding the best suited restoration plan.  This discretion used by SSs to make adjustments in field assignments is based on the nature of the outage and automatically impacts the schedules of field employees executing the outage.  Just as

---

[17]  The only difference between a must and managed-must job is that a managed-must job is not classified as an emergency but is still of the highest priority taking into account all other work in progress.
[18] The record demonstrates that field supervisors are authorized to develop work plans for a must or managed-must jobs which are submitted to SSs for discussion and review.

with TRSDs, must and managed-must jobs routinely result in automatic overtime work for field employees due to their around-the-clock high priority nature and completion time.  Likewise, in the event of a major system outage, SSs work together, along with SSSs and field supervision, to direct restoration of the distribution and transmission system.  Most major system outages are unintentional, such as a widespread blackout caused by a severe storm.  SSs are trained and authorized to independently shed load to respond to a major system outage and initiate emergency response procedures, without higher management involvement.  This can include the deployment of additional field employees as necessary to respond to the outage in order to maintain the integrity of the electrical system.  In this regard, the Employer has directed that should an abnormal condition occur without warning, SSs are vested with full authority to take whatever immediate and subsequent actions are necessary to stabilize the situation and maintain the reliability of the electrical system.  Following these initial stages of the outage performed by the SSs, subsequent decisions regarding major system outages are addressed and made by upper management officials company-wide.

Some SSs attend some management meetings, including outage duration meetings, engineering meetings addressing new technology, and supervisory meetings for Distribution Operations.

### 2.    *Student SSs*

The student SSs are trained in SS duties, as described above, in the classroom and on-the-job for approximately 13 months to become SSs. Lead SSS trainer Gary Jones is in charge of this training, assisted by SSS Gerald Moore and two SSs (one SS-1 and one SS-2).  Students are split into two classes of approximately seven students per class.  This includes about nine months of classroom and simulation training at the WWSC followed by four months of on-the-job training at the SOC.  In training the students, the trainers rely on a multitude of written materials, such as system operating practices, administrative procedures, substation handbook articles regarding system procedures in the SOC, and written diagnostic exercises created by SSSs.  Students are trained in all of the SS duties stated above.  A large part of training includes introducing company nomenclature of systems and equipment to the students as it relates to the SOC.  The SS trainers provide feedback to the SSS trainers regarding the student SS trainees.  The student SSs are not trained regarding supervisory tasks such as hiring, disciplining, terminating, laying off, recalling, adjusting employee grievances, approving overtime, or handling payroll issues.  Student SSs are required to pass a written exam and all-day simulation before becoming official SS-1s.  The record demonstrates that there is an additional six-month training period for SS-1s who desire to become SS-2s in order to operate the sub-transmission desks in the SOC.  This training is conducted at the SOC by lead SSS trainer Jones.[19]

### III.    Analysis

### A.    Board Law

Section 2(3) of the Act excludes from the definition of the term "employee" "any individual employed as a supervisor."  Section 2(11) of the Act defines a "supervisor" as:

---

[19] Additional NERC-certification is required to become a SS-2 which the SS completes separately on his/her own.

…any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not merely of a routine or clerical nature, but requires the use of independent judgment.

Individuals are "statutory supervisors if: 1) they hold the authority to engage in any one of the 12 listed supervisory functions, 2) their exercise of such authority is not of a merely routine or clerical nature , but requires the use of independent judgment, and 3) their authority is held in the interest of the employer." *NLRB v. Kentucky River Community Care*, 532 U.S. 706, 713 (2001). Supervisory status may be shown if the putative supervisor has the authority either to perform a supervisory function or to effectively recommend the same.

Consistent with *Kentucky River*, the *Oakwood Healthcare* Board adopted an interpretation of "independent judgment" that applies to any supervisory function at issue "without regard to whether the judgment is exercised using professional or technical expertise." The Board explained that "professional or technical judgments involving the use of independent judgment are supervisory if they involve one of the 12 supervisory functions of Section 2(11)." *Oakwood Healthcare*, 348 NLRB 686, 692 (2006). "[A]ctions form a spectrum between the extremes of completely free actions and completely controlled ones, and the degree of independence necessary to constitute a judgment as 'independent' under the Act lies somewhere in between these extremes." Id. at 693. The Board instructed that the relevant test for supervisory status utilizing independent judgment is that "an individual must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." Id. Further, the judgment must involve a degree of discretion that rises above the "routine or clerical." Id.

In applying this three part test, the Board continues to follow certain established principles. The burden to prove supervisory authority is on the party asserting it. Supra at 687; *Kentucky River*, supra, at 711-712. Second, any lack of evidence is construed against the party asserting supervisory status. *Elmhurst Extended Care Facilities, Inc.*, 329 NLRB 535, 536, fn. 8 (1999). Third, the Board's long-standing recognition that purely conclusory evidence is not sufficient to establish supervisor status remains viable. *Golden Crest Healthcare Center*, 348 NLRB 727, 731 (2006); *Volair Contractors, Inc.*, 341 NLRB 673, 675 (2004); *Sears, Roebuck & Co.*, 304 NLRB 193, 194 (1991). The Board requires evidence that the individual actually possesses supervisory authority. *Golden Crest Healthcare Center*, 348 NLRB 727, 731 (2006); *Chevron Shipping Co.*, 317 NLRB 379, 381 fn. 6 (1995) (conclusionary statements without specific explanation are not enough). Evidence in conflict or otherwise inconclusive will not be grounds for a supervisory finding. *New York University Medical Center*, 324 NLRB 887, 908 (1997), enfd. in relevant part 156 F. Ed 405 (2nd Cir. 1998); *The Door*, 297 NLRB 601 n.5 (1990); *Phelps Community Medical Center*, 295 NLRB 486, 490 (1989). See also, *Frenchtown Acquisition Co., Inc. v. NLRB*, 683 F.3d 298, 305 (6th Cir. 2012) enfg. 356 NLRB No. 94 (2011). In *Entergy Mississippi, Inc.*, 357 NLRB 2150, 2152-2154 (2011), the Board specifically

11

directed that the prescriptions for determining supervisory status enunciated in *Oakwood Healthcare* apply in the utility industry.

With regard to the exercise of supervisory authority, the Board has determined that individuals who possess the authority as defined in Section 2(11) of the statute can be held to be supervisors even if the authority has not been exercised. *Fred Meyer Alaska, Inc.*, 334 NLRB 646 (2001). Although the Act demands only the possession of Section 2(11) authority, not its exercise, the evidence still must be persuasive that such authority exists. *Avante at Wilson, Inc.*, 348 NLRB 1056, 1057 (2006). Job titles, job descriptions, or similar documents are not given controlling weight and will be rejected as mere paper, absent independent evidence of the possession of the described authority. Id.; *Golden Crest*, supra at 731, citing *Training School at Vineland*, 332 NLRB 1412, 1416 (2000), *Frenchtown Acquisition*, supra at 308, see also *NLRB v. Security Guard Service, Inc*., 384 F.2d 143, 149 (5th Cir. 1967) (It is well established that theoretical or "paper power" will not suffice to make an individual a supervisor).

Additionally, the Board cautions against finding supervisory authority based only on infrequent instances of its existence. *Family Healthcare, Inc*., 354 NLRB 254 (2009) (overruled on other grounds); *Golden Crest Healthcare*, supra at 730, fn.9. To separate straw bosses from true supervisors, the Act prescribes that the exercise of supervisory indicia be in the interest of the employer and requires the use of independent judgment. Accordingly, "the exercise of some supervisory authority in a merely routine, clerical, perfunctory or sporadic manner does not confer supervisory status on an employee." *Somerset Welding & Steel, Inc*., 291 NLRB 913 (1988), quoting *Feralloy West Co*., 277 NLRB 1083, 1084 (1985).

Thus, "the Board . . . exercise[s] caution 'not to construe supervisory status too broadly because the employee who is deemed a supervisor is denied rights which the Act is intended to protect." *Oakwood*, supra at 688, quoting *Chevron Shipping Co*., supra at 381; *Azusa Ranch Market*, 321 NLRB 811, 812 (1996).

### B.    Application of Board Law to this Case

The parties are in agreement that the primary indicia of supervisory status at issue are authority to assign, responsibly direct, and effectively recommend hiring and discipline, using discretion and independent judgment.

In reaching the conclusion that the SSs are not supervisors within the meaning of the Act, I rely on the following analysis and record evidence.

### 1.    Assignments

In *Oakwood Healthcare*, supra at 689, the Board clarified that the authority to assign under Section 2(11) means designating an employee to a place, such as a location, department, or wing; appointing an employee to a time, such as a shift or overtime period; or giving an employee significant overall duties. Ad hoc instruction to perform a discrete task is not assignment, id., and is discussed below in connection with the function of responsible direction.

### a. *Time and Place*

The cumulative record evidence does not reflect that SSs assign field employees to regular shifts or reporting times.  They do not assign employees by name and do not ever establish face-to-face contact with field employees.  The evidence does reflect that SSs occasionally dispatch field employees, by classification, during normal business hours.  At these times, the SSs primarily interact with field supervisors concerning when field employees will be needed for scheduled switching jobs.  When field supervisors are present the record is clear they are in charge of all of the field employees' work assignments, except for the execution of the switching job being handled remotely by the SS.

The evidence additionally reflects that SSs request field employees to work on trouble cases outside normal business hours.  In these situations, the ORC, AFC, or SS either requests that an on-call supervisor, if one is available, send a classification of field employee to the trouble site, or, more commonly, requests a field employee by classification via ARCOS, an automated call-in system.  Even in those situations where a field employee has been requested by an SS, or anyone else, the record demonstrates that the field employee, by union contract, can accept or reject the call, unless the field employee is on-call or  in the event of a major system outage.  The SSs have no contact with the field employees until they arrive at the trouble site. Once the requested field employee arrives at the work site via a field supervisor or ARCOS, this employee investigates the source of the trouble, reports the information to the field supervisor, if one is available, and the SS, and performs the switching operation.  If it is determined that the field employee is needed for another job at the same site or at another site, or if additional employees are needed, the SS can make these requests, however, those employees have the option to accept or reject the request.

When field employees are assigned to TRSD locations, they generally work until the trouble is cleared and even longer if additional outages are anticipated.  This can result in overtime expenses for the Employer.  In this regard, field supervisors input overtime rosters for field employees into ARCOS such that ARCOS calculates who is next in line for overtime hours and keeps track of overtime balances for all field employees.  SSs do not authorize overtime documentation for field employees or keep track of their overtime hours worked.  Ultimately, the field supervisors, not the SSs, possess full authority to assign and approve overtime for field employees.

In sum, the evidence fails to establish that the Employer's SSs appoint field employees to a time.  As the Board noted in ***Golden Crest***, it is well established "that the party seeking to establish supervisory authority must show that the putative supervisor has the ability to require that a certain action be taken; supervisory authority is not established where the putative supervisor has the authority merely to request that a certain action be taken."  Id. at 4.  See also, ***Entergy Mississippi***, supra at 2156.  Therefore, I find that the Employer has failed to establish that its SSs possess the authority to assign field employees to work time or overtime.

 The cumulative record shows that field employees are assigned to a set geographical working area per their applicable union contract.  They routinely receive their field assignments and schedules from their first line supervisors.  If any adjustments in assignments are necessary

in their regular schedules, or if an unplanned trouble call comes up, the SSs will generally call field supervisors, if available, to contact field employees to convey any re-assignments or direct field employees to a trouble call. When field supervisors are not available, the SSs input the field location into ARCOS which is provided to the requested employee. If necessary, the SSs can request that field employees move from one trouble location to another. However, the field employee can accept or reject the request per union contract.

Overall, the evidence establishes that the SSs request field employees through their supervisors during day and afternoon shift hours, and via ARCOS during off-hours. Such assignments are not permanent in nature and are either completely structured based on the Employer's designation of the field employee or established via ARCOS call-out lists. Accordingly, I find that, the SSs do not directly inform field employees as to where they are to go, but rather request field employees through their supervisors or ARCOS. The evidence fails to establish that these requests are "assignments" that are made with any supervisory discretion as required by *Oakwood*. *Entergy Mississippi*, supra at 2156.

### b.    Assignment of Significant Duties and Direction of Work

The cumulative record reflects that the SSs do not assign daily overall duties to field employees. Rather, field employees receive their daily assignments from their direct supervisors. Even when the SSs write switching orders for planned outages, the necessary field employees are scheduled by their supervisors to execute the orders during planned switching operations. In unplanned after-hours outage situations, the field employees are routed by ARCOS to specific outage locations and SSs request that these field employees execute switching orders to restore power. Once the field employee is at the trouble location, he/she is capable of assessing the situation and performing pre-switching activities independently. There is no face-to-face contact between SSs and field employees and communication between them is limited to discussing the switching order which often is a basic one-step instruction. If the switching order is more complicated, there is a routine procedure for reading and repeating the switching order that the SS and field employee follow. The switching orders are best viewed as a series of basic discrete tasks that the SSs relay to the field employees to be performed in a sequential order. The Board has determined that such ad hoc assignments are not sufficient to confer supervisory status. *Croft Metals*, supra.; *Entergy Mississippi*, supra at 2156-2157. Therefore, I find that the Employer has not established that its SSs assign significant overall duties to field employees

### c.    Independent Judgment and Discipline

Assuming arguendo that the Employer's SSs inform field employees as to where they are to report beyond the limited circumstances I have enumerated herein, I am guided by the principle that any assignment must be done with independent judgment before it is considered to be supervisory under Section 2(11). Thus, the question is whether the Employer has met its burden of proving by a preponderance of evidence that the SSs make judgments when assigning field employees to outage locations AND that any such judgments are free of the control of others and not controlled by detailed instructions. Mere inferences or conclusory statements without supporting evidence are insufficient to establish supervisory status. *Sears, Roebuck &*

14

*Co*., 304 NLRB 193 (1991).  I find that the Employer has failed to establish that the SSs exercise independent judgment when routing field employees to outage locations.

The cumulative record does not reflect that the SSs perform an analysis of the field employees' skill set and level of proficiency at performing certain tasks when routing field employees to an outage location.  This stands in stark contrast to the evidence presented in *Oakwood Healthcare* where the charge nurses analyzed the personality of the staff and patients and specific skills or abilities of the nursing staff in making assignments. Id. at 693; *Barstow Community Hospital,* 352 NLRB 1052, 1053 (2008).  *Entergy Mississippi*, supra at 2156.

Notwithstanding this lack of evidence, the Employer broadly contends that if SSs make decisions regarding assignment or direction based on any judgments, whether the judgment concerns the technical structure of the system or whether or not to assign field employees to address trouble cases, such judgments are supervisory because they are made independently and result in a supervisory function.  The record does reflect that the SSs manage unplanned major system outages, which are rare.  In this regard, if a major system outage occurs, the SSs are authorized to shed load and initiate emergency procedures, without higher management involvement, including the deployment of additional field employees as necessary to respond to the outage.  The Employer has also directed that should an abnormal condition occur without warning, SSs are vested with full authority to take whatever immediate and subsequent actions are necessary to stabilize the situation and maintain the reliability of the electrical system.  Thus, one SS's course of action in restoring power can differ from another's.  However, in handling and prioritizing these cases, the SSs consider, in collaboration with upper management and field supervision, such things as the number of customers affected, the size of the customer, and the weather.  Following the initial stages of these types of outages, subsequent decisions regarding major system outages are addressed and made by upper management officials company-wide.

I am not persuaded that the SSs exercise independent judgment and I do not find the Employer's arguments persuasive.  Further, even assuming that the Employer met its burden in establishing that SSs make judgments when handling system outages and assigning switching orders to field employees at outage locations, the evidence does not reflect that any such judgments are free of the control of others and are not, in fact, controlled by detailed instructions. The field employees receive their daily work assignments from their supervisors, not the SSs.  If the outage occurs during normal business hours, the field employees are re-directed by field supervisors, at the SSs' request, from their scheduled work assignments to the outage locations. If the trouble occurs after normal business hours or on a weekend, SSs may request field employees through ARCOS which has built-in call-out overtime lists inputted by the supervisors. In such situations, the evidence does not establish that the SSs, in requesting field employees to an outage location, are required to use any meaningful exercise of discretion.  The SSs do not ever have face-to-face contact with field employees.  Rather, they follow established ARCOS call-out procedures to request an employee to a trouble location.  Essentially, the evidence establishes that the SSs' requesting of field employees to an outage location is nothing more than a routine task.  Therefore, I conclude that the Employer has failed to prove that its SSs exercise independent judgment in assigning field employees to outage locations.

15

The record is absent of evidence that the SSs possess authority to discipline any field employees, or have access to their disciplinary files.  In arguing that SSs make effective recommendations for discipline, the Employer's witnesses testified in a conclusory manner that when an SS reports field employee conduct to a field supervisor warranting discipline, that field supervisor will impose discipline effectively recommended by the SS.  The only evidence offered by the Employer to support this was a single oral reminder issued to an SO by field supervision regarding the SO's disrespectful behavior toward an SS during a switching job.  The record indicates that while the SS in question presumably reported the field employee's performance to an SSS, the disciplinary investigation that ensued was conducted exclusively by field supervision upon receiving a report from an SSS.  There is no evidence that any SS, or SSS, was involved in this investigation.  Rather, the evidence demonstrates that field supervision reviewed audiotapes of the incident in question with the Employer's labor relations department and thereafter issued discipline to the SO.  The disciplinary write-up is signed by the SO field supervisor.  This sole example proffered by the Employer does not constitute an effective recommendation made by an SS to discipline a field employee.

## 2.  Responsible Direction

For direction to be responsible, the person directing must have oversight of another's work and be accountable for the other's performance.  To establish accountability, it must be shown that the putative supervisor is empowered to take corrective action, and is at risk of adverse consequences for others' deficiencies.  ***Oakwood Healthcare,*** supra at 691- 692.  As with all of the supervisory indicia enumerated in Section 2(11), responsible direction must entail independent judgment.  Thus, the responsible direction must be (a) independent, free of the control of others; (b) involve a judgment, that is, require forming an opinion or evaluation by discerning and comparing data, and (c) involve a degree of discretion that rises above the routine or clerical.  ***Oakwood Healthcare***, supra at 692-693; ***Golden Crest Healthcare***, supra at 730.  The Employer acknowledges in its memorandum of points of authorities that ***Oakwood Healthcare*** and ***Golden Crest Healthcare*** are controlling Board law regarding authority to assign and responsibly direct, including that the purported supervisor directing and performing the oversight of the employee must be accountable for the performance of the task by the other.  ***Oakwood Healthcare***, supra at 692.

The first question is whether the Employer has established that SSs *direct* other employees within the meaning of Section 2(11).  The Employer asserts that SSs responsibly direct field employees by directing the field employees in executing switching orders to restore power in outage situations.  The evidence reflects that as part of their duties, the SSs are responsible for writing switching orders for routine maintenance or to repair a section of line that has been damaged, or to restore the flow of electricity to a section of power lines that have been serviced or repaired.  The record demonstrates that the SSs have no face-to-face contact with the field employees and limited interaction with them regarding switching orders.  This is because most switching orders are basic one-step requests which the dispatched field employees are skilled to carry out without further direction.  If the switching order is more complicated, there is a routine procedure for reading and repeating the switching order that the SS and field employee follow.  Thus, at most, any interaction of SSs with field employees during switching operations amounts to little more than an exchange of information or guidance.  The evidence is insufficient

16

to establish that the SSs "direct" the field employees within the meaning of the definition set forth in ***Oakwood Healthcare.  Golden Crest Healthcare Center***, supra at 731.  See also ***Frenchtown Acquisition,*** supra at 311, 312.

The next question is whether the Employer has established that the SSs are *accountable* for their actions in directing the field employees.  I find that the Employer has not met its burden.  The record lacks evidence that SSs have been disciplined for failure to oversee or correct a field employee, or as a result of a field employee's failure to adequately perform her/his duties.  While SSS Tremberth testified that SSs can be and have been held accountable for field employee deficiencies, this testimony is simply a conclusion without evidentiary value.  In this regard, Tremberth testified that SSs have been coached and disciplined by SSSs and managers relating to outage issues involving field employees.  The record includes evidence of three write-ups issued to two SSs by SSSs.  These disciplinary records, placed into evidence by Petitioner, do not demonstrate that the SSs received discipline related to anything other than their *own* performance versus the deficient performance of field employees.  This merely shows that the SSs are accountable for their own performance or lack thereof, not that of field employees.  It does not establish responsible direction.  ***Entergy Mississippi,*** supra at 2156, citing ***Oakwood Healthcare*** at 695.  The record is devoid of any evidence demonstrating that any SSs have been issued discipline based on their direction of field employees in the performance of their duties.  The Employer also argues that accountability is demonstrated based on negative evaluations issued to SSs based on the deficient performance of field employees, as well as awards received by SSs based on field employees' positive performance.  However, the record is absent of any documentary evidence or substantive witness testimony that supports this argument.  Contrary to the Employer's characterization of the record evidence, I find that the SSs are not held accountable for the work of field employees.

Based on the foregoing, I find that the Employer has failed to carry its burden of establishing that its SSs responsibly direct or effectively recommend the discipline of field employees within the meaning of Section 2(11).

### 3.  Effective Recommendation to Hire

The Employer contends SSs make effective recommendations leading to hiring.  I do not agree.  In this regard, the Employer presented some evidence which it asserts establishes that SSs have been involved in hiring, including that SS Darryl Brown has participated in a hiring panel for the past three to six months.  The record evidence demonstrates that SS job openings are posted by HR and applicants are interviewed by an interview panel consisting of a SOC manager, an SSS and an SS.  The panel interviews and rates the applicant.  Following the interview, the SOC manager makes a recommendation to HR which is responsible for extending all hiring offers.  While SSS Tremberth testified that SS Brown has made recommendations as to applicants' suitability for hiring, and that he followed such recommendations, the record demonstrates that Brown made a recommendation as to one applicant.  Brown is the only SS that has participated on this hiring panel for a short time.  Moreover, the record is clear that the HR department makes all final hiring decisions.  Any discussions involving SS Brown regarding applicants do not rise to the level of recommending the hire of employees.  The Board has found that although putative supervisors may participate in discussions with job applicants such conduct does not rise to the level of recommending the hiring of employees.  ***Service Employees***

*Local 1-J*, 273 NLRB 328, 329, (1984); *Quality Chemical*, 324 NLRB 328, 329 (1997) (individuals were not supervisors even though they interviewed employees and completed an application form).[20]

### 4. Secondary Indicia

It is well established that where, as here, putative supervisors are not shown to possess any of the primary supervisory indicia, secondary indicia are insufficient to establish supervisory status. *Golden Crest Healthcare,* supra at 730 n. 10; *Ken-Crest Services,* 335 NLRB 777, 770 (2001). The Employer contends that the compensation system and evaluation system of the SSs, providing for performance-based bonuses, warrants a finding of supervisory status. However, the record evidence demonstrates that the field bargaining unit employees have comparable compensation plans including contractual bonuses. I cannot find the petitioned-for employees to be supervisory merely based on their compensation plan.

Other secondary indicia supports a finding that the petitioned-for employees are not supervisors. For instance, the Employer maintains an internal computer program, "Quest", which is accessible by employees. Among other things, it provides a profile of individual employees showing who reports to them, and who the employee reports to. According to Quest profiles in the record, none of the SSs are shown to have any direct reports. In addition, there is one Quest profile for an SO field employee in the record which does not show an SS to be a direct supervisor. SSs do not perform appraisals of field employees, do not make recommendations regarding their appraisals, and do not reward field employees. They cannot grant vacation or leave time or adjust grievances.

Although licenses, student training, and other Employer job descriptions and policies suggest the presence of supervisory authority, the Board has long held that evidence of actual authority trumps paper authority. *Valley Slurry Seal Co.*, 343 NLRB 233, 235 (2004), *Franklin Home Health Agency*, 337 NLRB 826, 829 (2002). I conclude that the SS written job descriptions are mere paper conveyances that do not impart actual supervisory authority.

For the reasons cited above, I find that the SSs are skilled employees capable of working independently under the guidelines and various control systems established by the Employer within a highly regulated industry. Thus, based upon my determination above that they do not exercise independent judgment in assigning or responsibly directing the field employees, I do not find that the Employer's assertion of these secondary indicia establish that its SSs are statutory supervisors.

### IV. Conclusions and Findings

Based upon the entire record[21] in this matter and in accordance with the discussion above, I find that the Employer has not met its burden of demonstrating that the SSs exercise

---

[20] This activity on the part of the SSs is distinguishable from the hiring activities involved in *Empress Casino Joliet Corp. v NLRB*, 204 F.3d 719, 721 (7th Cir. 2000), cited by the Employer, which involved putative supervisors employed as captains and first mates independently involved in interviewing job applicants and making hiring recommendations which were heavily relied on by the head of the marine operations department.

independent judgment in performing any of the Section 2(11) supervisory functions. Specifically, utilizing the standards the Board set forth in ***Oakwood Healthcare*** and reiterated in ***Entergy Mississippi***, I find that they do not possess authority to assign, responsibly direct, or effectively recommend hiring and discipline, using discretion and independent judgment, and therefore, they are not statutory supervisors, and I conclude and find as follows:

1.      The hearing officer's rulings made at the hearing are free from prejudicial error and are hereby affirmed.

2.      The Employer is engaged in commerce within the meaning of the Act, and it will effectuate the purposes of the Act to assert jurisdiction herein.[22]

3.      The labor organization involved claims to represent certain employees of the Employer.[23]

4.      A question affecting commerce exists concerning the representation of certain employees of the Employer within the meaning of Section 9(c)(1) and Section 2(6) and (7) of the Act.

5.      The following employees of the Employer constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All full-time and regular part-time system supervisor I's (SS-1s) and system supervisor II's (SS-2s), including those who are student SSs, employed by the Employer at its System Operations Center (SOC), 1 Energy Plaza, Detroit, Michigan, and Western Wayne Systems Operations Center (WWSOC), 8001 Haggerty Road, Belleville, Michigan; but excluding all senior system supervisors (SSSs), system operations centers training supervisors, process coordinators, managerial employees, guards and supervisors as defined in the Act.

## **DIRECTION OF ELECTION**

The National Labor Relations Board will conduct a secret ballot election among the employees in the unit found appropriate above.  Employees will vote whether or not they wish to be represented for purposes of collective bargaining by **Local 223, Utility Workers Union of America (UWUA), AFL-CIO.**

---

[21] The parties presented oral argument on the record, and the Employer submitted a Memorandum of Points of Authority in support of its position, which were carefully considered.
[22] The parties stipulated, and I find that, the Employer is an employer engaged in commerce within the meaning of Section 2(6) and (7) of the Act and is subject to the jurisdiction of the Board.  The Employer, during the calendar year 2015, a representative period, in conducting its business operations, derived gross revenues in excess of $250,000.
[23] The parties stipulated, and I find that, the Petitioner is a labor organization.

## A.    Election Details

The election will be held on February 6, 2017, from 5:30 a.m. to 7:00 a.m., and 5:30 p.m. to 7:00 p.m., at two separate locations: (1) the first floor service building in a conference room to be agreed upon located at SOC,1 Energy Plaza, Detroit, Michigan; and (2) in a conference room to be agreed upon located at WWSOC, 8001 Haggerty Road, Belleville, Michigan.

All ballots will be commingled and counted February 6, 2017, in  the  conference room at 1 Energy Plaza, Detroit, Michigan, after the second polling sessions close at 7:00 p.m., immediately upon the arrival of the ballots from the Western Wayne SOC.

## B.    Voting Eligibility

Eligible to vote are those in the unit who were employed during the payroll period ending **January 22, 2017**, including employees who did not work during that period because they were ill, on vacation, or temporarily laid off.

Employees engaged in an economic strike, who have retained their status as strikers and who have not been permanently replaced, are also eligible to vote.  In addition, in an economic strike that commenced less than 12 months before the election date, employees engaged in such strike who have retained their status as strikers but who have been permanently replaced, as well as their replacements, are eligible to vote.  Unit employees in the military services of the United States may vote if they appear in person at the polls.

Ineligible to vote are (1) employees who have quit or been discharged for cause since the designated payroll period; (2) striking employees who have been discharged for cause since the strike began and who have not been rehired or reinstated before the election date; and (3) employees who are engaged in an economic strike that began more than 12 months before the election date and who have been permanently replaced.

## C.    Voter List

As required by Section 102.67(l) of the Board's Rules and Regulations, the Employer must provide the Regional Director and parties named in this decision a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cell telephone numbers) of all eligible voters.  The Employer must also include in a separate section of that list,  the same information for those individuals who, according to this direction of election, will be permitted to vote subject to challenge.

To be timely filed and served, the list must be *received* by the regional director and the parties by **January 31, 2017**.  The list must be accompanied by a certificate of service showing service on all parties.  **The region will no longer serve the voter list.**

Unless the Employer certifies that it does not possess the capacity to produce the list in the required form, the list must be provided in a table in a Microsoft Word file (.doc or docx) or a

file that is compatible with Microsoft Word (.doc or docx). The first column of the list must begin with each employee's last name and the list must be alphabetized (overall or by department) by last name. Because the list will be used during the election, the font size of the list must be the equivalent of Times New Roman 10 or larger. That font does not need to be used but the font must be that size or larger. A sample, optional form for the list is provided on the NLRB website at www.nlrb.gov/what-we-do/conduct-elections/representation-case-rules-effective-april-14-2015.

When feasible, the list shall be filed electronically with the Region and served electronically on the other parties named in this decision. The list may be electronically filed with the Region by using the E-filing system on the Agency's website at www.nlrb.gov. Once the website is accessed, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.

Failure to comply with the above requirements will be grounds for setting aside the election whenever proper and timely objections are filed. However, the Employer may not object to the failure to file or serve the list within the specified time or in the proper format if it is responsible for the failure.

No party shall use the voter list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters.

### D.    Posting of Notices of Election

Pursuant to Section 102.67(k) of the Board's Rules, the Employer must post copies of the Notice of Election accompanying this Decision in conspicuous places, including all places where notices to employees in the unit found appropriate are customarily posted. The Notice must be posted so all pages of the Notice are simultaneously visible. In addition, if the Employer customarily communicates electronically with some or all of the employees in the unit found appropriate, the Employer must also distribute the Notice of Election electronically to those employees. The Employer must post copies of the Notice at least 3 full working days prior to 12:01 a.m. of the day of the election and copies must remain posted until the end of the election. For purposes of posting, working day means an entire 24-hour period excluding Saturdays, Sundays, and holidays. However, a party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.
Failure to follow the posting requirements set forth above will be grounds for setting aside the election if proper and timely objections are filed.

### RIGHT TO REQUEST REVIEW

Pursuant to Section 102.67 of the Board's Rules and Regulations, a request for review may be filed with the Board at any time following the issuance of this Decision until 14 days after a final disposition of the proceeding by the Regional Director. Accordingly, a party is not precluded from filing a request for review of this decision after the election on the grounds that it

did not file a request for review of this Decision prior to the election.  The request for review must conform to the requirements of Section 102.67 of the Board's Rules and Regulations. A request for review may be E-Filed through the Agency's website but may not be filed by facsimile.  To E-File the request for review, go to www.nlrb.gov, select E-File Documents, enter the NLRB Case Number, and follow the detailed instructions.  If not E-Filed, the request for review should be addressed to the Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570-0001.  A party filing a request for review must serve a copy of the request on the other parties and file a copy with the Regional Director.  A certificate of service must be filed with the Board together with the request for review.

Neither the filing of a request for review nor the Board's granting a request for review will stay the election in this matter unless specifically ordered by the Board.

Dated at Detroit, Michigan this 27th day of January, 2017.


/s/ Terry Morgan

Terry Morgan, Regional Director
National Labor Relations Board, Region 7
Patrick V. McNamara Federal Building
477 Michigan Avenue, Room 300
Detroit, MI 48226